Will you call the next case, please? 3-010-0541, Susan M. Murkowski, anonymous by Popperella v. D. Construction, Inc., abiding by Part C-4. Mr. Popperella. Thank you, Your Honor. Counsel, please report. Good morning, Your Honors. We are present on this matter for a motion for summary judgment that was granted at the trial court by Judge Doherty, granting summary judgment to the defendants, in which Judge Doherty found the defendant, D. Construction, held no duty to my client, Susan Barkowski, for the injury she sustained in an accident that occurred on October 8, 2007. The incident in question here revolves around a construction contract entered between D. Construction and the Village of Seneca on or about August 31, 2007. This was a multi-part contract. Parts 1 and 2 had to deal with the repair of places of asphalt on the road. Part 2 dealt with the overlay of asphalt over the existing road. And then the additional parts, I believe there was four parts total, related to the shoulder work. The pavement that was to be laid was to be laid at two inches, including the binder coat, and then subsequently the shoulders were to be done from the edge of the pavement and then tapered out to zero. And the idea was to be somewhere in the neighborhood of plus or minus two inches, tapered out to zero. In this particular case, my client was walking her dog on or about October 8 of 2007 down Hosek Street, which is one of the streets that D. Construction had contracted to pave in the village. She was walking along the road. It was dark at the time. A car was coming from the other direction, and she stepped off of the road onto the shoulder, not realizing that the drop was as significant as it was, twisting her ankle, ultimately breaking her ankle, and then suffering other injuries as well. It's important to note that approximately, excuse me, one week before, about six days before this, is when the asphalt was laid by D. Construction, and when the, and the shoulders were not done until I believe October 11th or several days after my client's fall. The reason I note that is, is the trial court felt that this was a classic, quote unquote, hunt doctrine case. And I respectfully disagree with that assertation. And the reason why is the hunt doctrine, as this court's well aware, indicates that an independent contractor owes no duty to third persons to judge the plans, specifications, or instructions which he is merely contracted to follow. If a contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications, unless they are so obviously dangerous that no competent contractor would follow them. And in this particular case, there is no dispute, I made no dispute on behalf of my client with regards to whether or not the plans were safe as they were, as the defendant had contracted for. My contention has always been twofold. Number one, that the project wasn't completed. The project was in the midst of being completed, and this ledge was left on the edge of the roadway. Now, the photographic evidence, which is attached to the record, indicates an area of asphalt with a drop off somewhere in the neighborhood of five and a half to six inches, as you can see from the tape measure being used in there. And my contention is, is that when you couple that ledge, which is five and a half or six inches, with the fact that there is an overage as related to the total amount of tonnage for that project, that they didn't, in fact, follow the plans accordingly. Had your client read this contract before she took her walk? Absolutely not, Your Honor. Okay. So, your client, so she doesn't know what the drop off is supposed to be, right? Correct. But she's out walking her dog in a construction site in the pitch black, right? I don't believe it was pitch black, but it was most certainly dark, Your Honor. And she fell and got hurt. This is correct. Sir, wouldn't one expect to get hurt walking to a road construction project in the middle, in the dark? Well, the point and the reason we brought suit was the way in which that road, that construction project had been done. Leaving that ledge, in my opinion, was negligence on the part of the construction company. They left it for at least a week. And as a result, they created a dangerous situation so that somebody who would be walking along the roadway would step off. And my client indicated it was dark, and when she looked down, it didn't look like there was the depth of drop off that there was. And that's when she ultimately tripped and fell down. I was thinking about this case that was dragged onto the court this week, and I must have gone by six road construction projects. Each and every one of them that was loaded with pitfalls for somebody to try to walk through that in the dark would undoubtedly get hurt. I know it's a different thing, but is there a common sense problem in this case? Well, I don't believe so, Your Honor. I would venture to guess that the road construction areas that you went to also had some sort of signage which allowed you to garner that they were, in fact, construction areas. This did not have that. Your client didn't know this. There was no indication that she was going through a construction project in this case. Didn't she testify that there were signs? She knew. I'm sorry, Your Honor. Let me tell you. No, go ahead. I think you've got the, just my question. She knew that the project was there because she lived, I don't know the, it was within a couple blocks of where the incident occurred. It might have been on the same block that she lived, just on a different street. She knew it was going on, but she had no idea that the drop off was what it was, as she indicated she had not walked on that roadway after they laid the asphalt for some time because I believe she said it was tacky and she didn't want to get any asphalt or material. Most, she didn't want to get it all over her dog's paws, number one, which I presume, you know, once you bring the dog in the house. I have labs, so I know that goes all too well. But nonetheless, she didn't want to, she hadn't walked in that area. She hadn't been in that area. So, she knew that an asphalt project had gone on, and I presume, and I guess I am just making an assumption that by living in the village, she was generally aware of the road project as related. But as I said, they lay this asphalt, and then as I submit, there's a photograph which shows this five and a half or six inch ledge, and she would have no idea that that was, that that would be there. Well, I mean, sometimes even to put a two-inch ledge, they've got to dig down next to it to put footings in, I mean, for different areas. Even if the asphalt's only supposed to be two inches, sometimes you have other depressions that are dug there for other constructive reasons. And if the project's not done, it's just not safe places to walk. Well, I believe that there's certainly some comparative negligence issues in this case, Your Honor. And I think that gets to, you know, down the road, and it's mentioned in the brief, and I don't know that I will argue it extensively, but with regards to the open and obvious danger, which is exactly what Your Honor is talking about. And then my client talking about the distractions she had faced. One being dark, and number two, there's a vehicle coming from the other direction, which causes her to step off. So, I mean, I believe that there are comparative issues in this case, certainly, but I believe that the defendant should be, that there are sufficient facts for a jury to determine whether or not there's liability in the case, and that there is a duty. And that, of course, like I said, the ledge that's there, they had finished the paving operations, they left no signage behind whatsoever, and then there's a runover on the amount of asphalt. Now, the engineer, or the representative of the engineers, Mike Farrell, I believe was his name, indicates that, you know, the overage, that can be common in a job like that. But the bottom line is, as one looks at the contract, you know, the whole project was supposed to be done. And I just think that when they let it sit for a week or ten days, whatever it was, minimum of a week, in that condition, they've created a construction site with a known, to them, danger, because they laid the asphalt, and then they leave this pitfall, which she comes across as she's walking along the roadway. The other point that I wanted to address is the permitted and intended user argument, which obviously is a difficult argument from my perspective as well. My client was walking along the roadway, and as the court's well aware, and the case law makes quite obvious, roadways are permitted and intended for cars, not necessarily for pedestrians. And the first area that I think we can make a, carve out an exception in this matter, is that the sidewalk in this matter was behind her, on the other side of the road. My recollection is that it was in bad condition, and for a period there was no sidewalk. She was walking in the area that she felt was most safe for her at that time. And the other distinguishment I think can be made is that this isn't, you know, this isn't a roadway so much as a construction site at this time. It's, you know, cars were allowed to utilize it as well, but they were certainly well aware from the time that they spent in Seneca that people utilized that roadway all the time. And I thought that that came out of Mr. Parrish's deposition, that they saw people walking in that area. So they, I certainly think that it would be conceivable that they would think not to leave the ledge that they did leave. The other point of contention that I had was with regards to the IDOT standards. The Department of Transportation standards had to be followed in this matter, and that was due to the fact that this was a motor fuel tax case, or a motor fuel tax job, so they have to follow the IDOT standards. And when you look at the standards, the 701.7, and it's a long standard, but it indicates the necessity for barricades in this sort of situation. I don't know that it requires a shoulder drop-off, but there should have been soft horses or something that would indicate to her that there's a potential danger, and that's our position here. To put signage for pedestrians? Signs for everybody, quite honestly, Your Honor. I mean, that's a heck of a drop-off in a car. That's not as we're going down the interstate, moving from one lane to another that may be uneven. That's a couple of inches. That's quite a drop-off for some cars. I would presume that could cause some damage. But based upon the facts that are here, we feel that summary judgment isn't appropriate, that a duty should lie on the defendants. Are there any other questions from Your Honor? No. No, thank you. Thank you, Judges. Ms. Thorpe? Thank you. Good morning. Good morning, Justices. I'm Marcia Thorpe on behalf of the defendant, Deconstruction. Your Honors, in this case, there is no issue of fact that Deconstruction did not breach any legal duty to the plaintiff, Mrs. Barkowski. I'm going to start by just responding to the plaintiff's arguments. And it seems to say, he seems to be putting forth that Deconstruction had a duty to somehow grade out the shoulder before she fell. And also to put some type of warning signs. I'll wait for the IDOT standards after I address the first two. The record is clear, and the contract is clear, that Deconstruction did not have a duty to grade out the shoulder at any specific time. The contract doesn't provide for that. And the testimony is, it is not provided in the contract. There's no issue. And we cite to the most recent Illinois Supreme Court decision in Thompson that says, we're not going to read in requirements and create duties into contracts that don't exist. This one could easily be written in. You must complete a shoulder within five days of laying the hot asphalt mix. It's not in there. There is also no contractual requirement that these signs be placed. I'm just going to assume he's saying that we have a duty to put a low shoulder sign for Mrs. Barkowski. There's no requirement for that contractually. But it's also not required because there's no duty to Mrs. Barkowski. She is not an intended user of the street. She is a pedestrian. And what I'd like to address, she did know it was under construction. She saw the fresh oil signs when the hot asphalt mix was laid out. And we cite to that in the record in our briefs. She lives two houses east of Hossack Street, which was where the road was under construction. So she lives two houses east. There are sidewalks on either side, which she testified to. There was a sidewalk alongside where she was walking on the street. She admitted that. It wasn't behind her, as I thought I heard that being said. And she was aware that there was a drop-off. She just didn't know how big of a drop-off. But then she was walking on it at night with a dog against traffic. And that's just not a situation for a reasonably foreseeable situation that this person would be doing that, that a pedestrian would be walking on the street with her dog. So no duty for that. Regarding the signage requirement under the IDOT standards, I would like to address that as well. And I just want to clarify something. A plaintiff identified it in his reply brief that the trial court relied on the wrong section. Instead of 701.07, he relied on 701.05. Well, what you see, it's of record that the trial court just cited to a previous provision the standard specifications were amended in 07. They're both of record. The language is, as far as substance goes, the same. And what that section applies to is for roadway construction four miles or more. So that section doesn't apply in this situation. There's no issue of fact that this construction for Hossack Street was 1,250 feet. So that section doesn't apply. Also, the engineer was in control of all signage. And the engineer signed off as deconstruction being in compliance with the whole contract. Finally, if there could be some conceivable way that deconstruction was required to follow the signage, it provides for barricades every 100 feet if it's less than 45 miles per hour there, barricades or vertical panels every 200 feet if it's more than 45 miles per hour there. The only way that deconstruction could owe the plaintiff a duty under this situation is whether she would be part of the class that this statute or rule was designed to protect. And she wasn't. I think we just talked about cars going off the side of the road. Yes, they could be in the class of people and vehicles designed for the protection of this rule. So they don't go off the road. Again, as I've already said, the person walking on the street at night under construction, against traffic, where sidewalk exists, that statute and that rule would not be applicable to her. Nor would her injury be the type of injury the rule is designed to prevent, somebody twisting or falling off the side. She also cannot establish causation for any of the signage, once again, because she knew. She admitted she knew. She just didn't know how big of a drop-off. Barricades or drop-off signs were not going to stop her conduct. She didn't walk on the street because she knew the tar was still wet. Not that it was a dangerous situation. And she also did not say, I want to clarify, that she didn't go in that area. Again, where you understand where she lives, it's intersection of Union and Hossack. She lives here. It's a dead end. So she was aware of the road construction. She just didn't walk on the street. Not that she didn't walk in the area. And the only other thing I did want to address was the overage. This is a classic hunt situation because there is no issue of fact that the deconstruction complied with all of the plans and specifications of the contract. They laid the two inches of asphalt. A photograph showing five and a half inches of drop-off doesn't negate or contradict the clear evidence that two inches were laid. It was measured three different ways. In addition, this was placed over a pre-existing road. And before the two inches was placed, part one of the contract required them to clear the aggregate and get rid of all the deep dirt and leaves and aggregate off the edge of the road which would, of course, lead to a drop-off. And the photographs show that. So that doesn't create an issue of fact. Regarding the overage of 19 tons on an estimated, I think, 521 tonnage project, the testimony was clear. It never comes in exactly as estimated. I think there's already identified in the contracts that driveways to allow for larger driveways than anticipated. 18 tons, Mike Farrell said, 10 to 20 tons overage is not an uncommon situation. In fact, it's always common to have it not become exactly as estimated. And so we believe this is a classic hunt situation. We believe the most recent Supreme Court decision in Thompson does apply to all of the extra duties that are alleged here. And unless your honors have any questions for me, I will thank you and ask you to affirm the decision by the trial court. Thank you. Mr. Pavarello. First, I don't believe it's a classic hunt situation because of the fact that while they did carry out provisions of the contract, I think there is most certainly a question of fact as to whether or not they carefully did so. Whether or not asphalt is laid and then the shoulder is in place for up to a week to 10 days later, I think there's certainly questions as to whether or not that is careful. First, with regards to the photograph, the photograph is clear. You can see clearly there's 5 1⁄2 or 6 inch gap. Wouldn't this be the first contractor in the history of certainly the state of Illinois that ever gave a municipality twice the asphalt they ordered? How could that picture be anything other than surmise? It's inconceivable that somebody would come in and double the thickness of the asphalt other than, because when you look at the side of the job, you put two inches on top of the road surface, but then where that picture is taken from, how could that be anything other than the way that was kind of explained? Well, I think part of the explanation was given with regards to the crowning of the roadways and there was no indication while there was talk of a measurement on the back of the paving machine which checks it as well as a probe as well as Mr. Farrell's checks, there's no indication as to where these checks are done. Is it one inch in the middle of the road where the road is higher and three inches out further? That's why I think there's a question of fact. The photo looks like it's new asphalt and it looks like it's six inches thick and I think that when you look at that in conjunction with the overage, there's questions that need to be resolved. Could it be the situation that the defendant talked about that this is always the case and there's always overage? Absolutely. But it can just as likely be that they put more asphalt than they were supposed to on the sides and they left this gap. There's no dispute whatsoever that they left the gap on the edge of the roadway and my point as to why I think this is taken out of the hunt area is that letting it sit for a week or ten days thereafter before the shoulders are placed created the hazard. Counsel talked briefly about causation issues where there was no indication because the plaintiff knew of the construction in the area. Well yeah, she knew of the area but she said she hadn't been on Hossack Street and that area, she stayed away from it because of the fresh blacktop, fresh oil as I indicated earlier and counsel alluded to as well. So she wasn't in that area. So would barricades have provided her warning which is part of our allegations against them? Absolutely. Counsel also indicated, I believe, that the IDOT standards weren't a part of the contract. I think it's very clear that they were in fact part of the contract. They had to follow what the IDOT specifications say and the reason they had to because it's a motor fuel case. It's paid for by state tax dollars. It's required. The contractor says it's up to the engineer to determine what signage is used. The contract seems to indicate that as well. The engineer on the project says, I'm not in charge of signage. The contractor takes care of the signage. So we have fingers being pointed both directions. The sidewalk that was there was on the other side of the road. It stopped. It wasn't contiguous. She was walking along the roadway in a construction site with a hazard that was created by the defendant. And as I indicated, leaving that project with that kind of gap wherever the gap came from. And it's certainly conceivable and certainly possible that that gap was left by that gap was partially contributed to the way the road laid as well as to the way that they laid the asphalt. Certainly conceivable. But the bottom line is that was their project that was their construction site and they left that hazard that way without any warning to people utilizing the road. And that's why I feel that this falls outside of Hunt. Just under your theory, would construction contractors have to make every road project safe at night before they leave the job at night for pedestrians to walk through? Not just pedestrians but for vehicles as well. And I'm not saying a blanket making a blanket statement if that's what your honor might be intimating is that I'm saying that they have to leave every job site safe for people to walk through. But in this particular area where there's a sidewalk on part of the other side of the street and not the rest and they've seen people walking on the streets in that area, I think it's certainly conceivable to them that pedestrians are going to use that area. And the hazard was left that way. Now the hazard turns out to be a hazard for a pedestrian because my client was walking her dog on that roadway. In the dark. In the dark. And she was on the opposite side. She wasn't walking on the same side as Travis. She was walking opposite so the car was on the other side of the road coming towards her and that's when she stepped off. But there was some light from the houses around there and she said she attributed that there was a drop off but she didn't attribute how deep the And as I indicated earlier, there's clearly comparative negligence in this matter. But the creation of the hazard was by the defendants and accordingly I feel that I'm asking your honors to find that there was a duty on the part of deconstruction and to remand this accordingly. Alright. Thank you. Thank you Mr. Pomperell. And Mr. Stork, thank you. This matter will be taken under advisement that the disposition will be issued and...